**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **POWER QUALITY & ELECTRICAL SYSTEMS, INC.; RAJINDER K. SINGH; AND TEJINDAR P. SINGH,**<br><br>    **Plaintiffs,**<br><br>    vs.<br><br>**BP WEST COAST PRODUCTS LLC,**<br><br>    **Defendant.** | **Case No.: 16-CV-04791 YGR**<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS; DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS; AND DENYING *DAUBERT* MOTIONS AS MOOT.**<br><br>**DKT. NOS. 52–54** |

This case arises from plaintiffs' Power Quality & Electrical Systems, Inc., Rajinder K. Singh, and Tejindar P. Singh suit for breach of contract relating to the purchase of two franchises to operate gasoline stations from defendant BP West Coast Products LLC ("BP"). Plaintiffs alleged three claims, namely (i) breach of contract; (ii) breach of the covenant of good faith and fair dealing; and (iii) violation of California Business and Professions Code section 17200. In response, BP asserted ten counterclaims against plaintiffs for breach of contract (Counts I, II, and VI); breach of unconditional guaranties (Counts III, V, VII, and IX), breach of loan agreements (Counts IV and VIII), and breach of an oral contract (Count X).

Defendant moves for summary judgment on all of plaintiffs' claims on grounds that (i) the claims are barred by the statute of limitations and equitable estoppel does not apply, and, in any event, (ii) the claims fail as a matter of law because plaintiffs cannot establish a triable issue as to an essential element of each. (Dkt. No. 54, Motion for Summary Judgment ("Motion").) BP also moves for summary judgment on each of its counterclaims.[1]

---

[1] In connection with plaintiffs' opposition to defendant's Motion, plaintiffs attached two separate documents containing various evidentiary objections. (Dkt. Nos. 58-1, 58-35.) Pursuant to Local Rule ("LR") 7-3(a), evidentiary objections "must be contained within the [objecting

Having carefully considered the pleadings and fully-briefed motions, the hearing held on December 5, 2017, and for the reasons set forth below, the Court **GRANTS** defendant's motion for summary judgment on plaintiffs' claims.[2] Further, BP's motion for summary judgment is **DENIED** as to counterclaims I, II, IV, VI, VIII and X and those claims are dismissed as untimely. The parties shall provide additional briefing on BP's motion for summary judgment as to counterclaims III, V, VII, and IX as specified below.

## I. BACKGROUND AND SUMMARY OF RELEVANT FACTUAL ALLEGATIONS

Plaintiffs filed their original complaint in Alameda Superior Court on July 22, 2016. (Dkt. No. 1 at 11.) Defendant removed the action to federal court on the basis of diversity jurisdiction. (*Id.*) On November 3, 2016, this Court granted defendant's motion to dismiss plaintiff's first amended complaint on statute of limitations grounds with leave to amend. Plaintiffs filed their Second Amended Complaint on November 17, 2016. (Dkt. No. 27 ("SAC").)

Plaintiffs' SAC relates to several franchise agreements with BP to operate gasoline stations and Mini Markets (the "Franchise Agreements"). The SAC alleges as follows:

---

party's] brief or memorandum." Here, plaintiffs make their evidentiary objections in a separate motion rather than within their opposition brief as required by LR 7-3(a). Therefore, plaintiffs' objections are **OVERRULED** as procedurally improper.

In BP's reply brief, defendant moves to exclude ¶¶ 5-9, 12-14, 30, and 33 of the declaration of Tejindar P. Singh on the ground that these statements "violate the sham affidavit rule by contracting Plaintiff's sworn testimony and/or the allegations in the [operative] complaint." (Dkt. No. 62, "Reply" at 3.) In support thereof, BP offers a two-line footnote which cross-references a separate 10-page chart, (Dkt. No. 62-2), which compares each challenged statement with the operative complaint, (Dkt. No. 27, Second Amended Complaint ("SAC")), and Mr. Singh's deposition. (Dkt. No.55. Ex. A ("Singh Dep.").) The Court finds that defendants' 10-page chart is also improper under LR 7-3(a) and therefore **OVERRULES** BP's motion to strike. In so holding, Court notes that defendant was plainly aware of the requirement imposed by LR 7-3(a) in light of BP's specific reference to this rule in its Reply. (Reply at 2-3.) Further, the Court highlights that defendant previously sought and was granted administrative relief to extend the page-limit for its Reply. (Dkt. No. 61.) If defendant required further relief to properly object to Mr. Singh's declaration, it was incumbent upon BP to seek such relief at the appropriate time.

[2] Defendant also moves to exclude the testimony of plaintiffs' damages expert Thomas Chapman and gas station operations expert Hardeep Gill. (Dkt. Nos. 52, 53.) In light of the Court's ruling, the Court **DENIES** as moot defendant's motions to exclude the expert testimony of Thomas Chapman and Hardeep Gill. (Dkt. Nos. 52, 53.)

**A.      Plaintiffs Contract with BP to Purchase Two Franchises**

Since 1998, plaintiffs have operated two gas stations, one in San Ramon, California and one in Dublin, California. (SAC ¶ 15.) In or about June 2007, BP sales representative Sonya Branson approached plaintiffs offering to brand the stations as ARCO gas stations. (*Id*. ¶ 16.) "Plaintiffs and BP then entered into various agreements (the "Franchise Agreements") to operate the San Ramon and Dublin stations as ARCO-branded fueling stations and Mini Markets." (*Id*. ¶ 16, Dkt. No. 54-2, Separate Statement of Undisputed Material Facts ("SSUMF"), Exs. F, G, S, and T.) The "agreements provided BP with sole discretion for selecting vendors and the manner in which fuel was delivered and paid." (SAC ¶ 16.) Prior to executing the contracts to convert both sites to ARCO-branded fueling stations and Mini Markets, BP representative "[Shaheenur] Rahman brought plaintiffs to three other BP and ARCO facilities with ampm Mini Markets that were 'similar' to the San Ramon and Dublin stations." (*Id*. ¶ 17.) Rahman allegedly "stated that these three stations were extremely profitable with over $100,000 in monthly store sales." (*Id*. ¶ 17.) Plaintiffs allege that Rahman provided plaintiffs with a $40,000 per month projection of profits for the San Ramon station.[3] (*Id*.)

In or around September 2007, plaintiffs and BP entered into loan agreements of $500,000 for each site to finance Mini Markets renovations and conversions. (SSUMF, Exs. AE, AF.) BP placed a lien on plaintiffs' San Ramon and Dublin stations. (SAC ¶ 18.) Plaintiffs also obtained a private loan of approximately $1 million to cover the remaining costs. (*Id.* ¶ 19.) On May 28, 2008, while the conversions were ongoing, plaintiffs received two letters from BP Regional Sales Manager Tom Reeder entitled "Notice of Termination" which stated that the Franchise Agreements

---

[3] Defendant disputes that Rahman provided any estimates or representations with regard to profitability for the San Ramon station. Mr. Singh's testified during his deposition that Mr. Rahman informed him that he should assume 250,000 gallons of gas sold per month at a profit margin of 8-10 cents per gallon when completing the "Profit and Loss Statement" component of plaintiffs' franchise application for the San Ramon site. (Singh Dep. at 186:15-18, 193:18-25.) The Court finds that Mr. Singh's figures yield anticipated profits of $20,000–25,000 per month which is substantially less than $40,000 the figure alleged in the SAC. The Court notes, however, that the $20,000–25,000 per month figure excludes Mini Market profits whereas Rahman's alleged representations regarding profitability presumably included such profits. Plaintiffs do not allege that Rahman provided specific profitability figures for the Mini Market.

"will terminate on November 30, 2008" due to plaintiffs' failure to "construct improvements" on the sites.  (Singh Decl., ¶ 7, Exs. 1, 2 (the "Notices of Termination").)  Within days of receiving the Notices of Termination, Mr. Singh met with BP franchise business consultant Eric Sell and the parties agreed not to terminate the Franchise Agreements.[4]  (Singh Dep. at 129:9-131:24, 135:8-19.)

## B.    The San Ramon Station Suffers Losses and Closes in April 2012

During the conversion process the San Ramon station began to suffer significant losses.  BP representatives for that region, including Rahman, Sell, and Patrick Lemons "promised that everything would improve once the ampm [Mini Market] conversion was complete."  (*Id.* ¶ 21.) In late 2011 and early 2012, plaintiffs had several meetings with BP's Tom Reeder, who assured them that they were "operating the station correctly within the guidelines provided by BP and . . . that the station would become profitable as promised."  (*Id.* ¶ 24.)  Unfortunately, the losses continued.  (*Id.* ¶ 23.)

Plaintiffs allege that BP breached the Franchise Agreements by (i) refusing to allow plaintiffs a temporary voluntary allowance ("TVA") relating to fuel sales, thereby preventing plaintiffs from effectively competing with neighboring gas stations; (ii) preemptively announcing that it would not "under any circumstances . . . consent to approve additional and alternative vendors for the ampm mini-mart[,]" preventing plaintiffs from competing in the local market; and (iii) unreasonably withholding consent to plaintiffs' repeated requests to reduce cooked food supplies during certain hours of operation, leading to higher costs and waste of excess food.  (*Id.* ¶¶ 27, 28.)

In April 2012, plaintiffs met with Lemon and Sell and informed them that plaintiffs could not continue operating the station.  On April 22, 2012, plaintiffs closed the San Ramon station.  (*Id.*

---

[4] Plaintiffs argue for the first time in their opposition brief that these Notices of Termination voided the Franchise Agreements.  (Dkt. No. 58 at 3-4.)  However, the Court declines to entertain this argument for three reasons: First, the SAC makes no mention of these Notices of Termination, much less alleges that the Notices of Termination voided the Franchise Agreements.  Second, plaintiffs' first cause of action based BP's alleged breach of the Franchise Agreements in 2012 is logically inconsistent with plaintiffs' new argument that the Franchise Agreements were terminated in 2008.  Finally, Mr. Singh testified that after receiving the Notices of Termination and meeting with Sell he still considered himself "bound" by the Franchise Agreements.

¶¶ 26, 30.) On May 17, 2012, BP issued plaintiffs a "Notice of Breach of Contract and Termination" for the San Ramon station, seeking immediate return of equipment and payment of liquidated damages and repayment of loans and financing totaling over $700,000. (SSUMF, Ex. C.)

In late May 2012, plaintiffs met with Sell to discuss the amicable closure of the San Ramon station. (SAC ¶ 33.) Plaintiffs allege that they "responded" to BP's Notice of Breach of Contract and Termination by indicating that they were "prepared to contact their counsel and commence legal action against BP for misrepresentations as to the San Ramon station and financial misconduct as to the Dublin station." (*Id.*) Sell provided plaintiffs with the contact information of an individual who was building his own station, and plaintiffs then arranged to sell him their equipment. (*Id.*) Plaintiffs further aver that plaintiffs and BP "agreed and understood that upon the sale of the BP equipment . . . the relationship between plaintiffs and BP, with respect to the San Ramon station, was terminated and that neither were indebted to each other." (*Id.* ¶ 33.) Plaintiffs believed that this agreement (the alleged "Walkaway Agreement") "superseded the alleged claims outlined in the San Ramon Termination Letter." (*Id.*)

Plaintiffs claim Sell made assurances that the Franchise Agreements and loan terms were concluded with no further obligation and that plaintiffs agreed to forego commencing litigation based upon those assurances. (*Id.* ¶¶ 3, 33, 39, 40.)

## C. The Dublin Station Starts Off Profitable, Then Closes In July 2012

On the other hand, the Dublin station was "moderately profitable" when it opened in 2009. (*Id.* ¶ 25.) In June 2012, after plaintiffs closed the San Ramon station, BP changed the fuel payment terms from four days after delivery to collect on delivery ("COD"), effective immediately. (*Id.* ¶ 36.) BP controlled the price and timing of all fuel load deliveries under the Franchise Agreements. (*Id.* ¶ 35.) After BP implemented the change, plaintiffs did not have sufficient funds or notice to pay for the next two fuel loads. (*Id.*) BP then initiated an additional fee of approximately $2,000 for each fuel load moving forward. (*Id.* ¶ 36.) Plaintiffs allege that BP was retaliating against them for closing the San Ramon station. (*Id.* ¶ 56.)

In "early July 2012," plaintiffs closed the Dublin station. (*Id.* ¶¶ 2, 38.) Upon meeting with Sell, he "confirmed that the relationship had terminated and never mentioned payment of liquidated damages, repayment of loans, or returning any signage or equipment to BP at any point during or after this meeting." (*Id.* ¶ 38.) "As with the San Ramon station, plaintiffs and Mr. Sell understood that the relationship between plaintiff and BP had ended and that the parties were not indebted to each other in any way." (*Id.*)

On July 23, 2012, BP issued another "Notice of Breach of Contract and Demand for Payment" stating that plaintiffs had breached the Dublin Franchise Agreements and demanding over $1 million in liquidated damages, repayment of loans and financing, and past deliveries of fuel. (SSUMF, Ex. D.) In early August 2012, plaintiffs contacted Lemons to confirm the closure of the San Ramon and Dublin stations and to notify him that the July 23, 2012, Notice of Breach of Contract and Demand for Payment letter was inconsistent with the agreements reached with Sell regarding the termination of their relationship with BP. (SAC ¶ 40.) Mr. Lemons allegedly indicated that he would need "check with management on the question of whether plaintiffs could disregard the letter" but did not contact plaintiffs again. (*Id.*)

### D. Plaintiffs Discover BP's Remaining Liens in 2015

In or around 2015, approximately three years after rebranding the two gas stations to sell Chevron gasoline, plaintiffs met with their banking representative on an unrelated matter and learned that BP had not removed its lien on the Dublin station. (*Id.* ¶ 42.) They later learned that BP had not removed its lien on the San Ramon station either. (*Id.* ¶ 42.) On or about July 22, 2016, plaintiffs allege that BP secretly contacted Chevron to inform them that they were seeking to proceed with non-judicial foreclosure on the San Ramon and Dublin stations. (*Id.* ¶ 43.)

Plaintiffs filed the instant suit on July 22, 2016, notably without a claim for quiet title.

## II. LEGAL FRAMEWORK

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact as to the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

Where the moving party has the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion.  *Anderson*, 477 U.S. at 250; *Soremekun*, 509 F.3d at 984; *see* Fed. R. Civ. P. 56(c), (e).  The opposing party's evidence must be more than "merely colorable" and must be "significantly probative."  *Anderson*, 477 U.S. at 249–50.  Further, the opposing party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence showing a genuine dispute of material fact exists.  *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Nevertheless, when deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011).  A district court may only base a ruling on a motion for summary judgment upon facts that would be admissible in evidence at trial.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010); Fed. R. Civ. P. 56(c).

**III.  DISCUSSION**

Defendant argues that all of plaintiffs' claims fail because they are barred by the applicable statutes of limitations.  The Court addresses in subsection A whether each claim is time-barred.  In subsection B, the Court turns to whether defendant is prohibited from asserting the statute of limitations pursuant to the doctrine of equitable estoppel.  Finally, the Court addresses defedant's counterclaims.

## A.      Statute of Limitations

With regard to plaintiffs' breach of contract claim, under California law the statute of limitations for breach of a written contract is four years.  Cal. Civ. Proc. Code § 337(1). Here, plaintiffs allege that BP breached the terms of the parties' Franchise Agreements for the San Ramon and Dublin station, respectively.  (SAC ¶¶ 44–50.)

Regarding the San Ramon station, the SAC alleges that on April 22, 2012, plaintiffs closed that station because "BP refused to abide by the contract terms and/or work with plaintiffs in any meaningful way to improve the profitability of the San Ramon station."  (*Id.* ¶¶ 30, 31.)  The alleged breaches of contract leading to the closure of the San Ramon station included BP's breach of (i) paragraph 5 of the "Contract Dealer Gasoline Agreement" by refusing to grant TVAs (*id.* ¶ 47); (ii) article 12.04 of the Mini Market Agreement by informing plaintiffs that any requests for additional or alternative vendors would be not be granted (*id.* ¶ 48); and (iii) article 13.03 of the Mini Market Agreement which caused plaintiffs to maintain an excess supply of food and beverages.  (*Id.* ¶ 49).  The SAC states that each of these breaches occurred before plaintiffs closed the San Ramon station on April 22, 2012.  Therefore, the four-year statute of limitations began to run by that date at the latest.  Accordingly, plaintiffs' breach of contract claim regarding the San Ramon station filed over four years later on July 22, 2016, is untimely unless, in this case, estoppel applies.

With respect to the Dublin station, plaintiffs similarly allege that BP's breaches of the Franchise Agreements caused plaintiffs to suffer monetary damages.  (*Id.* ¶ 50.)  Plaintiffs closed the Dublin station in early July 2012, by which point the statute of limitations commenced.  (*Id.* ¶¶ 2, 38.)  Accordingly, for the same reasons as the San Ramon station claim, plaintiffs' breach of contract claim related to the Dublin station is time-barred unless, again, estoppel applies.

With respect to the second claim for breach of the covenant of good faith and fair dealing and the third claim for violations of Business and Professions Code section 17200, the same analysis applies. In California, the statute of limitations for theses claims is four years.  *See Fehl v. Manhattan Ins. Grp.*, 2012 WL 10047, at *4 (N.D. Cal. 2012) (citing *Love v. Fire Ins. Exch.*, 221

Cal.App.3d 1136, 1144 (1990)) and Cal. Bus & Prof. Code § 17208, respectively.  Accordingly, plaintiffs' second and third claims are similarly time-barred.

**B.     Equitable Estoppel**

The Court now turns to whether defendant is estopped from asserting the statute of limitations as a defense.

**1.     Legal Standard**

"A defendant will be estopped to assert the statute of limitations if the defendant's conduct, relied on by the plaintiff, has induced the plaintiff to postpone filing the action until after the statute has run." *Mills v. Forestex Co.,* 108 Cal.App.4th 625, 652 (2003); *see also McMackin v. Ehrheart,* 194 Cal.App.4th 128, 140 (2011).  "Under California law, equitable estoppel requires that: (1) the party to be estopped must be apprised of the facts; (2) that party must intend that his or her conduct be acted on, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) the party asserting the estoppel must reasonably rely on the conduct to his or her injury." *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1051–52 (9th Cir. 2008) (quoting *Honig v. San Francisco Planning Dep't,* 127 Cal.App.4th 520, 529 (2005)).  "California equitable estoppel is thus similar to and not inconsistent with federal common law, as both focus on actions taken by the defendant which prevent the plaintiff from filing on time." *Id*. at 1052.  "Of critical importance is a showing of the plaintiff's actual and reasonable reliance on the defendant's conduct or representations." *Naton v. Bank of California*, 649 F.2d 691, 696 (9th Cir. 1981) (citing *Cooper v. Bell*, 628 F.2d 1208, 1214 (9th Cir. 1980)).

The Ninth Circuit has explained that to establish equitable estoppel a "plaintiff must point to some fraudulent concealment, some active conduct by the defendant . . . 'to prevent the plaintiff from suing in time.'" *Lukovsky* 535 F.3d at 1052 (quoting *Guerrero v. Gates,* 442 F.3d 697, 706 (9th Cir. 2006)).  "For a defendant to be equitably estopped from asserting a statute of limitations, the plaintiff must be 'directly prevented . . . from filing [a] suit on time.'" *Vaca v. Wachovia Mortg. Corp.,* 198 Cal.App.4th 737, 746 (2011) (alterations in original, citation omitted).  Further,

a plaintiff must "proceed[] diligently once the truth is discovered." *Lantz v. Centex Homes*, 31 Cal.4th 363, 384 (2003).

### 2. Discussion

Plaintiffs argue that they were prevented from filing suit within the statute of limitations period as a result of the alleged Walkaway Agreement which led plaintiffs to believe that the parties' relationship had ended and they would not pursue any claims against each other under the Franchise Agreements. Defendant counters that the alleged Walkaway Agreement fails to establish equitable estoppel because (i) plaintiffs did not actually rely on the Walkaway Agreement, (ii) even if plaintiffs did rely on the Walkaway Agreement such reliance would not have been reasonable, and, in any event (iii) plaintiff did not proceed diligently in filing suit once they discovered that the liens on their property had not been extinguished. The Court addresses each argument.[5]

### a. Actual Reliance

"Of critical importance [to a claim of equitable estoppel] is a showing of the plaintiff's actual and reasonable reliance on the defendant's conduct or representations." *Naton*, 649 F.2d at 696 (citing *Cooper*, 628 F.2d at 1214). First, defendant argues that Mr. Singh did not actually rely on the Walkaway Agreement. In support of this assertion, defendant highlights that Mr. Singh never informed his lenders, accountants, or new franchisor that he had reached an agreement with BP to terminate the Franchise Agreements and forgive over $1.9 million in unpaid debt. (Singh Dep. at 403:16-19, 405:14-18, 408:5-20.) Plaintiffs counter with the testimony of Mr. Singh who states that he did not "pursue litigation against BP in reliance on" the Walkaway Agreement. (Singh Decl. ¶ 31.) The Court declines to make a credibility determination at this juncture and finds that Mr. Singh's declaration is sufficient to establish a triable issue with regard to plaintiffs' *actual* reliance on "defendant's conduct or representations."

---

[5] Defendant also argues that the oral Walkaway Agreement cannot support equitable estoppel because the oral agreement was unenforceable under the statute of frauds. However, BP cites no authority in support of their argument that equitable estoppel cannot be based on an oral agreement, even if, it is ultimately not enforceable.

### b. Reasonable Reliance

Defendant further argues that Mr. Singh's reliance on the oral Walkaway Agreement was not reasonable. In determining reasonable reliance, courts take into account a plaintiff's particular knowledge and experience. *Hoffman v. 162 N. Wolfe LLC*, 228 Cal.App.4th 1178, 1194, *as modified on denial of reh'g* (2014) (citing *All. Mortg. Co. v. Rothwell*, 10 Cal.4th 1226, 1240 (1995)). The Court finds that Mr. Singh's reliance on the oral Walkaway Agreement was not reasonable on two grounds.

First, the Franchise Agreements contained bolded disclaimers appearing on the same page as plaintiffs' signatures which stated, "**No representative of BPWCP is authorized by BPWCP to orally modify, amend, add to or waive any provision of this Agreement**." (SSUMF, Exs. F, G, S, T (emphasis in originals).) This was not a burdensome contract, that is, the document itself was two pages with attachments. The disclaimer was on the second page. The record reflects that Mr. Singh is a sophisticated business person who previously worked as an engineering consultant for PG&E and has owned and operated at least five gas stations since 1997. (Singh Dep. at 33:13–13, 33:22–36:10.) However, during his deposition Mr. Singh claimed that he did not read any of the Franchise Agreements before signing them. (Singh Dep. at 275:18–276:20.) Even crediting Mr. Singh's testimony, the Court finds that it was not reasonable for a sophisticated business person like Mr. Singh to fail to read the operative contacts and rely solely on Sell's oral representations when the Franchise Agreements expressly, plainly, and conspicuously prohibited oral modifications and waivers. *See Golden W. Baseball Co. v. City of Anaheim*, 25 Cal.App.4th 11, 48 (1994) (finding that plaintiffs' reliance on an oral representation was unreasonable because the operative contract required modifications in writing).

Second, when the alleged Walkaway Agreement was reached BP had already demanded more than $700,000 in unpaid loans, gasoline, and other payments with regard to the San Ramon station. (*See* SAC ¶¶ 31-32, 38-39.) After the alleged Walkaway Agreement was reached, BP demanded an additional $1.2 million for the Dublin station.[6] Mr. Singh never articulated a

---

[6] The fact that plaintiffs received BP's demand for $1.2 million approximately one month *after* the alleged Walkaway Agreement further suggests that plaintiffs' reliance was not reasonable.

United States District Court
Northern District of California

plausible theory which explained why BP would agree to forgo its demands and the significant sum of money at stake. Thus, again, the Court finds it was not reasonable for a sophisticated business person such as Mr. Singh to rely on the oral Walkaway Agreement as proof that BP had abandoned its claims for $1.9 million in unpaid expenses.[7]

Plaintiffs argue that their actions were reasonable because BP consistently modified agreements orally. In support of this theory, plaintiffs offer Mr. Singh's declaration which states that the parties "consistently engaged in a pattern and practice of orally modifying written agreements, disregarding notices of default, and acting as if contracts were operational when they had been terminated", such as with the May 28, 2007, Notices of Termination. (Singh Decl., ¶ 7, Exs. 1, 2.) Specifically, Mr. Singh testified that within days of receiving the Notices of Termination he met with Sell and the parties agreed orally not to terminate the Franchise Agreements. (Singh Dep. at 129:9-149:20.)

Plaintiffs do not persuade. First, plaintiffs offer no evidence that the incident involving the Notices of Termination reflected a pattern and practice rather than an isolated occurrence. Second, and in any event, the incident regarding the Notices of Termination is distinguishable from the alleged Walkaway Agreement. Unlike the Franchise Agreements, the Notices of Termination were not contracts and did not contain bold disclaimers. Nor did they require revocations to be in writing. Rather, they were notices. Nothing more. The proffered evidence is insufficient to establish a pattern and practice of orally modifying written contracts which contain express prohibitions on oral modification.[8]

_____

[7] Defendant also argues that it was unreasonable for Mr. Singh to rely on the Walkaway Agreement for the independent reason that it "should have been obvious" that Sell "did not have authority to bind [defendant] to such an agreement." (Motion at 7.) However, this argument fails in light of the fact that Sell apparently had authority to void the May 28, 2008, Notices of Termination. (*See* Dkt. No. 62 at 4.)

[8] The Court further notes that plaintiffs offer no explanation as to why plaintiffs' theory that the Notices of Termination voided the operative contracts was not raised in any of plaintiffs' complaints or as an affirmative defense in plaintiffs' answer to defendant's counterclaims. (Dkt. Nos. 1, 14, 18, 27, 41.)

Accordingly, plaintiffs' reliance on the oral Walkaway Agreement was not reasonable in light of the circumstances. In reaching this conclusion, the Court notes that (i) the Franchise Agreements specifically indicated, in bold text, on the same page as plaintiffs' signatures, that the agreements could not be modified orally; (ii) Mr. Singh is a sophisticated business person yet failed to read the operative contracts; (iii) BP had demanded more than $1.9 million in unpaid loans, gasoline, and other payments; and (iv) just one month after Mr. Singh and Sell allegedly entered into the Walkaway Agreement plaintiffs received a demand for $1.2 million for the Dublin station which was wholly inconsistent with the Walkaway Agreement. The doctrine of equitable estoppel cannot be established on this ground.[9]

The Court thus finds that plaintiffs' claims are time-barred and **GRANTS** defendants' motion for summary judgment on plaintiffs' claims.

### c. Diligence

Finally, defendant argues that equitable estoppel does not apply because plaintiffs "did not proceed[] diligently [in filing suit] once the truth [was] discovered." *Lantz*, 31 Cal.4th at 384. Specifically, defendant point out that Mr. Singh waited nine months after learning that the liens on his property had not been extinguished "during which period the statute of limitations passed." (Motion at 5.)

Defendant does not persuade. During the nine months between when plaintiffs discovered the liens and when they filed suit, plaintiffs investigated their claims, researched legal issues, identified and retained counsel, and prepared a complaint. The Court thus finds that triable issues exist as to whether such a delay constitutes a failure to proceed diligently.

---

[9] Accordingly, the Court **DENIES** defendant's motion for summary judgment on counterclaim Counts I, II, IV, VI, VIII, and X as untimely. The Court notes that defendant concedes that such claims are "pled in the alternative and based on [plaintiffs'] allegations that the alleged 'walkaway agreement' tolls the statute of limitations." (Motion at 23.)

The Court further finds that the parties' sparse briefing on counterclaim Counts III, V, VII, and IX does not provide sufficient information to allow this Court to issue a reasoned decision on these counterclaims. Specifically, each party devotes less than one page to despite that these counterclaims arise from at least six different contracts spanning hundreds of pages. (Motion, Exs. AD, AE, AF, AG, AG, AI.)

In summary, because plaintiffs cannot prove reasonable reliance as part of a claim for equitable estoppel, defendant is not barred from asserting the statute of limitations defense, and summary judgment is **GRANTED** on plaintiffs' claims.

### C. Defendant's Counterclaims.

Defendant concedes that counterclaims I, II, IV, VI, VIII and X were pled in the alternative to plaintiffs' claims. For the reasons stated above, those claims similarly fail and are dismissed.

With respect to counterclaims III, V, VII, and IX, the Court orders additional briefing as the briefing on these counterclaims was sparse. Plaintiffs shall file an opposition not to exceed seven pages to defendant's motion for summary judgment on counterclaims III, V, VII, and IX, by no later than **Friday, December 22, 2017**. Defendant may file a reply not to exceed seven pages by no later than Thursday, **January 4, 2018**.

## IV. CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. BP's motion for summary judgment is **GRANTED** as to plaintiffs' claims for breach of contract (first cause of action), breach of the covenant of good faith and fair dealing (second cause of action), and Cal. Bus. and Prof. Code section 17200 (third cause of action) on the ground the such claims are untimely.

2. BP's motion for summary judgment is **DENIED** on counterclaims I, II, IV, VI, VIII and X and those claims are dismissed as untimely.

3. The parties shall provide additional briefing on BP's motion for summary judgment as to counterclaims III, V, VII, and IX. Plaintiffs shall file an opposition not to exceed seven pages to defendant's motion for summary judgment on counterclaims III, V, VII, and IX, by no later than **Friday, December 22, 2017**. Defendant may file a reply not to exceed seven pages by no later than **Friday, January 5, 2018**.

This terminates Docket Nos. 52–54.

**IT IS SO ORDERED**.

Date: December 12, 2017

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**